**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CYNOSURE, INC., | § | |
| Plaintiff, | § | Civil Action No. 17-cv-1560 |
| | § | |
| v. | § | |
| | § | PLAINTIFF'S ORIGINAL |
| | § | COMPLAINT |
| INVASIX, INC. d/b/a | § | |
| INMODE AESTHETIC SOLUTIONS, | § | |
| Defendant. | § | (JURY TRIAL) |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Cynosure, Inc. ("Plaintiff" or "Cynosure"), files this Complaint and Application for Injunctive Relief against Defendant, Invasix, Inc. dba Inmode Aesthetic Solutions ("Defendant" or "InMode").

## I.     PARTIES

1.     Plaintiff Cynosure, Inc. ("Cynosure") is a Delaware corporation and maintains its corporate headquarters and principle place of business in Westford, Massachusetts.

2.     InMode is an Israeli entity with a principle place of business at Tabor Building, Shaar Yokneam, Yokneam 20692, Israel.

3.     InMode has a United States office at 21084 Bake Parkway, Ste. 106, Lake Forest, California 92630.  From in or around 2016, InMode, a competitor of Cynosure, has engaged in unfair competition by hiring Cynosure employees in violation of their Non-Competition Agreements (the "Poached Employees") to acquire, misappropriate, and use Cynosure's confidential information and trade secrets.  InMode employed the Poached Employees in or around Houston, Texas.

1

4.     The Poached Employees include but are not limited to: Shakil Lakhani ("Lakhani"), Tyler Lembke ("Lembke"), Lance Baird ("Baird"), Douglas Kaufman ("Kaufman"), Jonathan D'Arc ("D'Arc"), Jayson McLeod ("McLeod"), Victor Upshaw ("Upshaw"), and Mitchell Good ("Good").

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as the amount in controversy exceeds the sum or value of $75,000 and Cynosure and InMode are citizens of different states.

6.     InMode has wrongfully and tortuously interfered with Cynosure's business in Texas as detailed in this complaint, and/or wrongfully used Cynosure's trade secrets and confidential information in its activities in Texas as detailed in this complaint.  In addition, InMode regularly conducts business in Texas and specifically in this judicial district.

7.     Personal jurisdiction over InMode and venue, therefore, is proper in this Court.

8.     Venue is proper in Houston County, Texas, pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Cynosure's claims occurred in Houston County, Texas, and a substantial part of intellectual property that is the subject to the action is situated in Houston County, Texas.

## III.     NATURE OF THE CASE AND FACTS

9.     This is an action for injunctive relief and damages due to the actions of InMode, a direct competitor of Cynosure, for interference with Cynosure's employment relationships with Cynosure employees including but not limited to the Poached Employees; inducement of Poached Employees to breach the non-competition, non-

solicitation, and/or non-disclosure provisions in their Invention, Non-Disclosure, Non-Solicitation and Non-Competition Agreement (the "Non-Competition Agreement") with Cynosure; and tortious interference with Cynosure's business, for the purpose of harming Cynosure's business and wrongfully obtaining an unfair competitive advantage in the marketplace.   The Poached Employees Non-Competition Agreements contain non-competition provisions prohibiting them for a period of one year after the termination or cessation of employment, from developing, designing, producing, marketing, selling or rendering or assisting any other person in marketing, selling or rendering products or services competitive with those developed, designed, produced, marketed, sold or rendered by Cynosure.

10.    Cynosure is informed and believes, and on the basis of that information and belief alleges that at all times mentioned in this complaint, the Poached Employees, including but not limited to Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman were the agents and employees of Defendant InMode, and in doing the things alleged in this complaint were acting within the course and scope of that agency and employment.

11.    InMode's actions in interfering with Cynosure's business and its employment relationships with its employees in Texas, interference with Cynosure's employment contracts with its employees in Texas, and inducement of Cynosure's former employees in Texas to breach their Non-Competition Agreements and continues to cause harm to Cynosure.

## A.    CYNOSURE'S BUSINESS

12.    Cynosure is a leading global developer and manufacturer of a broad array of light-based aesthetic and medical treatment systems.  Its products are used to provide a diverse range of treatment applications including body contouring, cellulite/fat reduction,

hair removal, tattoo removal, wrinkle reduction, improving skin appearance through the treatment of superficial benign vascular and pigmented lesions, and the treatment of acne, leg veins, and cellulite.

13.     Cynosure markets, services, and supports products in over 60 countries and has offices in North America, the United Kingdom, and Canada, and distributors worldwide.

14.     Cynosure's products, described above, are graded by the FDA and regulated under various state laws as medical devices that can often be operated and used only by, or under the supervision of, a licensed medical doctor. Accordingly, Cynosure's customers are principally physicians, physician practice groups, and Med Spas that employ a physician medical director.

15.     Cynosure has spent a great deal of money, time, labor, and skill in strategic planning and client development.  Through these efforts, Cynosure has developed a substantial amount of confidential information and trade secrets.  Cynosure's trade secrets and confidential information include, but are not limited to, information concerning: (a) proprietary product designs, specifications, and design plans; (b) proprietary and safeguarded cost structures; (c) confidential pricing structures and marketing techniques; (d) proprietary and confidential lists and contacts of reliable and cost effective local and overseas product manufacturing resources; (e) confidential internal employee development techniques, training, device knowledge, marketplace competition strategies; and (f) proprietary and safeguarded procedures to meet and exceed the specific requirements of Cynosure's customers.

///

16.     Cynosure's trade secrets and confidential information are valuable assets belonging solely to Cynosure, and not generally known, nor readily ascertainable, by the public or Cynosure's competitors.  The secret nature of this information gives Cynosure a competitive advantage in the marketplace.  Specifically, Cynosure derives actual and potential economic value from its trade secrets and confidential information, in part, because this information is not generally known to and not readily ascertainable through proper means by, other persons who can obtain economic value from disclosure.

17.     Additionally, Cynosure has valuable and distinguished goodwill assets. For example, Cynosure has developed relationships with its customers and manufacturers. Cynosure expended substantial resources to build and maintain its relationships with its customers and manufacturers.

18.     Cynosure is involved in an extremely competitive industry in which confidentiality and customer goodwill are valuable assets.

19.     Recognizing the value of resources that Cynosure invested in developing its intellectual property in the form of trade secrets and confidential information, Cynosure has taken numerous steps to ensure the continued confidentiality of its proprietary information.

20.     First, Cynosure makes it clear to its employees who work on and/or have access to its trade secrets and confidential information that such information is confidential and proprietary to Cynosure and is not to be used for anyone's benefit other than Cynosure and is not to be disclosed to competitors or persons not subject to keeping such information confidential.  In this regard, the Poached Employees signed Non-Competition agreements acknowledging the confidential nature of Cynosure's intellectual property.

5

21.     Second, Cynosure's confidential information and trade secrets are safeguarded by several limited access measures.  As part of its limited access measures, Cynosure: (a) restricts office entry to employees or to visitors accompanied by employees; (b) restricts access to its computer systems through the use of computer passwords and computer firewalls; (c) promulgates rules for the dissemination of confidential information; and (d) keeps its office locked and secure during non-working hours with a security firm monitoring the building.

22.     Third, Cynosure limits the sharing and dissemination of trade secret and confidential information to those persons who need to know such information to perform their job duties.  Such information is known to the Poached Employees, including Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman.

23.     Fourth, Cynosure requires its manufacturers and agents to execute confidentiality and non-disclosure agreements to hold, maintain and not disclose to any other person or entity, without Cynosure's permission, Cynosure's confidential information and trade secrets.  These manufacturers and agents agreed to take all reasonable steps necessary to maintain the secrecy of Cynosure's confidential information and trade secrets and to prevent the disclosure of Cynosure's confidential information and trade secrets to any other person or entity.  Lakhani, Lembke, Baird and Kaufman are aware of the execution of confidentiality and non-disclosure agreements by Cynosure's manufacturers and agents relevant to this dispute.

24.     All of these measures are specifically intended to ensure the continuing confidentiality of Cynosure's trade secrets and confidential information.  Cynosure's trade secrets and confidential information are a large part of its success and are the result of many years of effort.    A competitor with access to Cynosure's trade secrets and

confidential information would use or inevitably use such information to its or his advantage and to the detriment of Cynosure.  Moreover, the mere use of Cynosure's confidential and trade secret information in this highly competitive business would irreparably harm Cynosure by, among other things, causing loss of trust with Cynosure's customers, damages being inadequate to provide a complete remedy.

**B.     INMODE'S BUSINESS**

25.     InMode manufactures, markets, and sells medical devices that use radio frequency and light laser technology for skin treatment and contraction, skin tightening, hair removal, skin pigmentation and vascular lesions, cellulite/fat reduction, and body contouring, competing directly with Cynosure.

**C.     LAKHANI'S EMPLOYMENT AND AGREEEMENT WITH CYNOSURE**

26.     Cynosure employed Mr. Lakhani in a number of positions, including Territory Manager, Area Sales Manager and Sales Director.  In 2013, Mr. Lakhani was promoted to Regional Sales Director.  As Regional Sales Director, Mr. Lakhani had access to Cynosure's most valuable trade secrets and confidential information, including, but not limited to, its technology, business plan, marketing plan, customer lists, products, costs, pricing, and product development plans.

27.     As Regional Sales Director, Lakhani had knowledge of Cynosure's top performing sales people and their margins, efforts, and skills not generally known in the industry or to the public.  Additionally, as Regional Sales Director, Mr. Lakhani attended high level meetings at Cynosure and was privy to the most sensitive of Cynosure trade secret and confidential information.  As part of his duties, he was responsible for managing the territory managers.  Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of

its sales people, not generally known in the industry or to the public.

28.     In connection with his employment as Regional Sales Director, Mr.
Lakhani executed an Invention, Non-Disclosure, Non-Solicitation, and Non-Competition
Agreement on October 14, 2014.  In that agreement, Mr. Lakhani agreed:

> For a period of one year after the termination or cessation of such
> employment for any reason, [he] will not directly or indirectly: (i)
> as an individual proprietor, partner, stockholder, officer,
> employee, director, joint venture, investor, lender consultant, or in
> any other capacity whatsoever (other than as the holder of not
> more than one percent of the combined voting power of the
> outstanding stock of a publicly held company), develop, design,
> produce, market, sell or render (or assist any other person in
> developing, designing, producing marketing, selling or rendering),
> products or services competitive with those developed, designed,
> produced, marketed, sold or rendered by the Company while [he]
> was employed by the Company; or (ii) solicit, divert or take away,
> or attempt to divert or to take away, the business or patronage of
> any of the clients, customers or accounts, or prospective clients,
> customers or accounts, of the Company which were contracted,
> solicited or served by [him] while employed by the Company.

29.     Mr. Lakhani resigned from his position as a Regional Sales Director to take
on a role at InMode that directly violates his non-competition obligations.  Further, the
Lakhani Non-Competition Agreement contains confidentiality and non-disclosure
provisions, in which Mr. Lakhani agreed that he "will not disclose any Proprietary
Information to any person or entity other than employees of, or consultants to, the
Company or use the same for any purposes. . . without the written approval by an officer
of the Company, either during or after his employment with the Company, unless and until
such Proprietary Information has become public knowledge without fault by [him]." In
addition, Mr. Lakhani agreed that "for a period of one year after the termination or
cessation of [his] employment for any reason, [he] will not directly or indirectly . . .
recruit, solicit or hire any employee of the Company, or induce or attempt to induce any

employee of the Company to terminate his/her employment with, or otherwise cease his/her relationship with, the Company."  In violation of the non-solicitation provision, Mr. Lakhani has solicited Cynosure's employees – including Mr. Tyler Lembke, Mr. Lance Baird, and Mr. Doug Kaufman, and other Poached Employees.

30.     The intention of these Confidentiality and Non-Compete covenants was to permit Mr. Lakhani to operate as a Cynosure Regional Sales Director in his assigned territories while remaining loyal to Cynosure's commercial interests and while protecting Cynosure's critical trade secret information and proprietary market data.

**D.     LEMBKE'S EMPLOYMENT AND AGREEEMENT WITH CYNOSURE**

31.     Cynosure employed Mr. Lembke on April 20, 2016.  Cynosure employed Mr. Lembke in several positions, including MLT Product Specialist.  As an MLT Product Specialist Mr. Lembke recently specialized in the introduction and launch of Cynosure's innovative niche technologies into the marketplace.

32.     As a Product Specialist for Cynosure, Mr. Lembke had knowledge of Cynosure's products and technologies not generally known in the industry or to the public.  As part of his duties, Lembke was also responsible for Cynosure's sales.  Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of its sales people, not generally known in the industry or to the public.  Mr. Lembke also had the opportunity to cultivate relationships with other members of the sales team, such as Mr. Lakhani.

33.     In connection with his employment Mr. Lembke executed an Invention, Non-Disclosure, Non-Solicitation, and Non-Competition Agreement on January 15, 2015.  In that agreement, Mr. Lembke agreed:

> For a period of one year after the termination or cessation of such employment for any reason, [he] will not directly or indirectly: (i) as an individual proprietor, partner, stockholder, officer, employee, director, joint venture, investor, lender consultant, or in any other capacity whatsoever (other than as the holder of not more than one percent of the combined voting power of the outstanding stock of a publicly held company), develop, design, produce, market, sell or render (or assist any other person in developing, designing, producing marketing, selling or rendering), products or services competitive with those developed, designed, produced, marketed, sold or rendered by the Company while [he] was employed by the Company; or (ii) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contracted, solicited or served by [him] while employed by the Company.

34.     Mr. Lembke resigned from his position as MLT Product Specialist at Cynosure to take on a role at InMode that directly violates his non-competition obligations.  Further, the Lembke  Non-Competition Agreement, contains confidentiality and non-disclosure provisions, in which Mr. Lembke agreed that he "will not disclose any Proprietary Information to any person or entity other than employees of, or consultants to, the Company or use the same for any purposes. . . without the written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by [him]."   In addition, Mr. Lembke agreed that "for a period of one year after the termination or cessation of [his] employment for any reason, [he] will not directly or indirectly . . . recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company to terminate his/her employment with, or otherwise cease his/her relationship with, the Company."

///

**E.     BAIRD'S EMPLOYMENT AND AGREEEMENT WITH CYNOSURE**

35.     Cynosure employed Mr. Baird on May 21, 2012.  Cynosure employed Mr. Baird in several sales and management positions, including Area Sales Manager.

36.     As an Area Sales Manager, Baird was a member of the sales team and had knowledge of Cynosure's top performing sales people and their margins, efforts, and skills not generally known in the industry or to the public.  As part of his duties, he was responsible for Cynosure's sales.   Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of its sales people, not generally known in the industry or to the public.  Mr. Baird also had the opportunity to cultivate relationships with other members of the sales team.

37.     In connection with his employment Mr. Baird executed an Invention, Non-Disclosure, Non-Solicitation, and Non-Competition Agreement on May 9, 2012.  In that agreement, Mr. Baird's agreed:

> For a period of one year after the termination or cessation of such employment for any reason, [he] will not directly or indirectly: (i) as an individual proprietor, partner, stockholder, officer, employee, director, joint venture, investor, lender consultant, or in any other capacity whatsoever (other than as the holder of not more than one percent of the combined voting power of the outstanding stock of a publicly held company), develop, design, produce, market, sell or render (or assist any other person in developing, designing, producing marketing, selling or rendering), products or services competitive with those developed, designed, produced, marketed, sold or rendered by the Company while [he] was employed by the Company; or (ii) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contracted, solicited or served by [him] while employed by the Company.

38.     In or around January 2017, Mr. Baird resigned from his position at Cynosure to take on a role at InMode that directly violates his non-competition

obligations.  Further, the Baird Non-Competition Agreement, contains confidentiality and non-disclosure provisions, in which Mr. Baird agreed that he "will not disclose any Proprietary Information to any person or entity other than employees of, or consultants to, the Company or use the same for any purposes. . . without the written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by [him]." In addition, Mr. Baird agreed that "for a period of one year after the termination or cessation of [his] employment for any reason, [he] will not directly or indirectly . . . recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company to terminate his/her employment with, or otherwise cease his/her relationship with, the Company."

**F.      KAUFMAN'S EMPLOYMENT AND AGREEEMENT WITH CYNOSURE**

39.     Cynosure employed Mr. Kaufman on February 18, 2014.  Cynosure employed Mr. Kaufman in several sales and management positions, including Area Sales Manager.

40.     As an Area Sales Manager, Mr. Kaufman was a member of the sales team. Mr. Kaufman had knowledge of Cynosure's top performing sales people and their margins, efforts, and skills not generally known in the industry or to the public.  As part of his duties, he was responsible for Cynosure's sales. Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of its sales people, not generally known in the industry or to the public. Mr. Kaufman also had the opportunity to cultivate relationships with other members of the sales team.

41.     In connection with his employment Mr. Kaufman executed an Invention, Non-Disclosure, Non-Solicitation, and Non-Competition Agreement on February 7, 2014.  In that agreement, Mr. Kaufman agreed:

> For a period of one year after the termination or cessation of such employment for any reason, [he] will not directly or indirectly: (i) as an individual proprietor, partner, stockholder, officer, employee, director, joint venture, investor, lender consultant, or in any other capacity whatsoever (other than as the holder of not more than one percent of the combined voting power of the outstanding stock of a publicly held company), develop, design, produce, market, sell or render (or assist any other person in developing, designing, producing marketing, selling or rendering), products or services competitive with those developed, designed, produced, marketed, sold or rendered by the Company while [he] was employed by the Company; or (ii) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contracted, solicited or served by [him] while employed by the Company.

42.     In or around January 2017, Mr. Kaufman resigned from his position at Cynosure to take on a role at InMode that directly violates his non-competition obligations.  Further, the Kaufman Non-Competition Agreement, contains confidentiality and non-disclosure provisions, in which Mr. Kaufman agreed that he "will not disclose any Proprietary Information to any person or entity other than employees of, or consultants to, the Company or use the same for any purposes. . . without the written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by [him]." In addition, Mr. Kaufman agreed that "for a period of one year after the termination or cessation of [his] employment for any reason, [he] will not directly or indirectly . . . recruit, solicit or hire any employee of the Company, or induce or attempt to induce any employee of the Company to terminate his/her employment with, or

otherwise cease his/her relationship with, the Company."

### G.    INMODE's RAIDING OF CYNOSURE EMPLOYEES

####   a.    Lakhani

43.    Upon information and belief, in late 2016 InMode's Global CEO Moshe Mizrahy ("Mizrahy") and InMode's CEO of Americas Erik Dowell ("Dowell") began recruiting Mr. Lakhani to leave Cynosure to become InMode's new Executive Vice President of Sales, North America.  For example, in 2016, Mizrahy determined that despite its "progress in North America during the last few years . . . [InMode] . . . [had] reached a point where [it] need[ed] to make management and organizational changes" and that its "current management in North America ha[d] reached its managerial limit." (Ex. 1 at 1-2 – 10/7/2016 Email from Mizrahy to Dowell.)

44.    Upon information and belief, in or around October 14, 2016, Mizrahy, on behalf of InMode, instructed Dowell: "Regarding Management and Team – you will have full authority to replace and change any position holder that you would like to replace." (*Id.* at 1 – 10/14/2016 Email from Mizrahy to Dowell.)

45.    InMode was extremely anxious to make those personnel changes. (*Id.*)

46.    Thereafter, on January 31, 2017, Dowell sent an email to Yang Phan at InMode, to introduce Cynosure employees Mr. Lakhani and Mr. Lembke to InMode as "the dream team" for the purpose of providing Mr. Lakhani and Mr. Lembke, while they were still employed with Cynosure, sales materials and presentations on InMode's products and technologies.  Erik Dowell sent this email to Mr. Lakhani and Mr. Lembke while they were still employed with Cynosure. (Ex. 2 – 1/31/2017 email from Erik Dowell to Mr. Lakhani, Mr. Phan, Mr. Bishop, and Mr. Lembke.)

14

47.     Upon information and belief and as evidence by the January 31, 2017 email, Mr. Lakhani began assisting InMode while still in the employ of Cynosure.

48.     Upon information and belief, while still working for Cynosure, Mr. Lakhani:

a.   attended InMode corporate training sessions;

b.   contacted clientele of Cynosure on behalf or for the benefit of InMode and in violation of the Non-Competition Agreement;

c.    contacted key contact personnel at clientele of Cynosure (via contact information known to Mr. Lakhani solely by virtue of his employment with Cynosure) on behalf of for the benefit of InMode, and in violation of the Non-Competition Agreement;

d.   solicited business on behalf of or for the benefit of InMode in violation of the Non-Competition Agreement;

e.   created new accounts with clientele of Cynosure on behalf or for the benefit of InMode in violation of the Non-Competition Agreement; and

f.   solicited and is presently continuing to solicit Cynosure's customers and clientele in the geographic area contemplated and encompassed by the Non-Competition Agreement.

49.     Upon information and belief, the products which Mr. Lakhani is selling to Cynosure clients on behalf of InMode, are being manufactured by InMode using specifications, marketing information and other data and information proprietary to Cynosure which was retained by Mr. Lakhani and disclosed to InMode in breach of his Non-Competition Agreement.

50.     As another example, on February 3, 2017, Erik Dowell of InMode copied Mr. Lakhani on an email, while Mr. Lakhani was still employed with Cynosure, informing Mr. Lakhani and others that Mizrahy had approved salary increases for certain InMode employees. (Ex. 3 – 2/3/2017 Email from Erik Dowell to Mr. Lakhani, Mr. Bishop, and Mr. Mitchell.)

51.     Based upon the above, Cynosure believes that InMode solicited and induced Mr. Lakhani to become employed with InMode and that Mr. Lakhani was working for InMode, a direct competitor, while still employed by Cynosure, and used Cynosure's resources to do so.

52.     Mr. Lakhani's last day of employment with Cynosure was February 10, 2017. On February 14, 2017, InMode issued a press release that it had hired Mr. Lakhani as its Executive Vice President of Sales, North America. (Ex. 4 – 2/14/2017 Press Release)

53.     As Cynosure's Regional Sales Director, Mr. Lakhani had access to Cynosure's most valuable trade secrets and confidential information, including, but not limited to, its technology, business plans, marketing plans, customer lists, products, costs, pricing and product development plans.   Upon information and reasonable belief, Cynosure believes that Mr. Lakhani has used and disclosed, and continues to use and disclose, Cynosure's Confidential Information on behalf of InMode and for InMode's benefit.

54.     InMode employed Mr. Lakhani with knowledge of his contractual obligations, including his confidentiality and non-solicitation obligations, and with the understanding that, in performing his duties for InMode and making the desired personnel changes, Mr. Lakhani might violate his Non-Competition agreement with Cynosure, including his post-termination confidentiality and non-solicitation obligations.

55.     As Vice-President of Sales for North America, Mr. Lakhani's InMode territory covers the same potential customer base and includes many of the same customers as his former Cynosure region. This situation will lead to the inevitable use and disclosure of Cynosure's Confidential Information, and likely already has. Knowledge of Cynosure's Confidential Information about Cynosure's national business and marketing strategies and its customers in his region for InMode places Mr. Lakhani at an unfair competitive advantage against Cynosure.

56.     Through the customer relationships he developed through Cynosure's reputation and goodwill during his employment, and knowledge of customers' purchase history, pricing, any complaints or issues and other Confidential Information, Mr. Lakhani will be able call upon, service, and sell to those customers without having to put in the time, effort, research, and work otherwise required to develop those customers and acquire their business – in effect giving him unfair leg up in competing against Cynosure. Upon information and reasonable belief, Cynosure believes that Mr. Lakhani has used and disclosed, and may be continuing to use and disclose, Cynosure's Confidential Information in his employment with and for the benefit of InMode.

57.     In his positions with Cynosure, Mr. Lakhani knew that Cynosure entered into Non-Competition agreements with its employees, including Mr. Tyler Lembke, Mr. Lance Baird, and Mr. Doug Kaufman, and knew of those agreements.

58.     Upon information and belief, Mr. Lakhani thereafter began directly and indirectly soliciting Cynosure's employees, including, but not limited to, the Poached Employees, on behalf of InMode, to leave Cynosure and become employed with InMode. For example, upon information and belief, Mr. Lakhani, acting on behalf of InMode, solicited Good on the condition that he attend the Cynosure national sales meeting to

17

obtain proprietary information from Cynosure, for the benefit of InMode.

59.     Upon information and belief, InMode has induced, encouraged, approved and/or ratified Mr. Lakhani's aforementioned actions.  The acts of Mr. Lakhani, were performed on behalf or for the benefit of InMode and/or while in the employment of InMode, and/or were within the course and scope of that employment or within the authority delegated by InMode.

60.     As a result of Mr. Lakhani's aforementioned breach of the Non-Competition Agreement, Cynosure has suffered, and will continue to suffer, loss of business opportunity, violation of its intellectual property rights, a loss of business differentiation and reputation and InMode will have acquired enhances positioning and resources to compete in the market, all of which are damages directly or proximately caused by Mr. Lakhani's breach of the Non-Competition Agreement.

**b.     Lembke**

61.     Upon information and belief, Mr. Lembke was approached by Mr. Lakhani to join InMode.  Upon information and belief, on January 31, 2017, Dowell sent an email to Yang Phan at InMode, to introduce Cynosure employees Mr. Lakhani and Mr. Lembke to InMode as "the dream team" for the purpose of providing Mr. Lakhani and Mr. Lembke sales materials and presentations on InMode's products and technologies.  Erik Dowell sent this email to Mr. Lakhani and Mr. Lembke.  (Ex. 2 – 1/31/2017 email from Erik Dowell to Mr. Lakhani, Mr. Phan, Mr. Bishop, and Mr. Lembke.)

62.     Mr.  Lembke's last day of employment with Cynosure was February 9, 2017.  On February 14, 2017, InMode issued a press release that it had hired Mr. Lembke as its Vice President of Sales for the West Region (Ex. 4 - 2/14/2017 Press Release)

63.     As evidence by the January 31, 2017 email, Mr. Lembke began assisting InMode while still in the employ of Cynosure.  For example, on January 30, 2017, Mr. Baird wrote to Mr. Lembke "I know the official start date isn't until Feb[ruary] 6th but I'd like to get a head start on learning some of the new technology and prep for upcoming meetings.  Can you see what we might be able to get out hands on as far as PowerPoint slides and if maybe there [is] a top rep[resentative] in another area who'd be open to chat possible?" (Ex. 2)   In response, Mr. Lembke copied Erik Dowell at InMode and responded: "Erik, I'd like to get Lance some slides and data if possible.  He's got some meetings already set and is ready to rock.  Let me know if we can get something in his hands or if we need to wait." (*Id.*)

64.     Upon information and belief, while still working for Cynosure, Mr. Lembke:

a.  contacted clientele of Cynosure on behalf or for the benefit of InMode and in violation of the Non-Competition Agreement;

b.   contacted key contact personnel at clientele of Cynosure (via contact information known to Mr. Lembke solely by virtue of his employment with Cynosure) on behalf of for the benefit of InMode, and in violation of the Non-Competition Agreement;

c.  solicited business on behalf of or for the benefit of InMode in violation of the Non-Competition Agreement;

d.  created new accounts with clientele of Cynosure on behalf or for the benefit of InMode in violation of the Non-Competition Agreement; and

e.  solicited and is presently continuing to solicit Cynosure's customers and clientele in the geographic area contemplated and encompassed by the Non-

Competition Agreement.

65.     Upon information and belief, the products which Mr. Lembke is selling to Cynosure clients on behalf of InMode, are being manufactured by InMode by the use of specifications, marketing information and other data and information proprietary to Cynosure which was retained by Mr. Lembke and disclosed to InMode in breach of the Non-Competition Agreement.

66.     InMode employed Mr. Lembke with knowledge of his contractual obligations, including his confidentiality and non-solicitation obligations, and with the understanding that, in performing his duties for InMode and making the desired personnel changes, Mr. Lembke might violate his Non-Competition agreement with Cynosure, including his post-termination confidentiality and non-solicitation obligations.

67.     Based upon the above, Cynosure believes that InMode solicited and induced Mr. Lembke to become employed with InMode and that Mr. Lembke was working for InMode, a direct competitor, while still employed by Cynosure, and used Cynosure's resources to do so.

68.     Upon information and belief, Mr. Lembke thereafter began directly and indirectly soliciting Cynosure's employees, on behalf of InMode, to leave Cynosure and become employed with InMode.

69.     As Vice-President of Sales for the West Region, Mr. Lembke's InMode territory covers substantially the same potential customer base and includes many of the same customers as his former Cynosure region. This situation will lead to the inevitable use and disclosure of Cynosure's Confidential Information, and likely already has. Knowledge of Cynosure's Confidential Information about Cynosure's national business and marketing strategies and its customers in his region for InMode places Mr. Lembke at

an unfair competitive advantage against Cynosure.

70.     Through the customer relationships Mr. Lembke developed through Cynosure's reputation and goodwill during his employment, and knowledge of customers' purchase history, pricing, any complaints or issues and other Confidential Information, Mr. Lembke will be able to call upon, service, and sell to those customers without having to put in the time, effort, research, and work otherwise required to develop those customers and acquire their business – in effect giving InMode an unfair leg up in competing against Cynosure.

71.     As former MLT Product Specialist for Cynosure, Mr. Lembke has knowledge of Cynosure's trade secrets and confidential information about Cynosure's products and technologies which places Mr. Lembke at an unfair competitive advantage against Cynosure.  Therefore, Mr. Lembke's position at InMode will lead to the inevitable use and disclosure of Cynosure's Confidential Information and likely already has.

72.     Cynosure has invested substantial monies to create proprietary designs, solutions, initiatives and equipment to ensure that Cynosure can provide cutting edge technologies and services to its customers.  As a former MLT Products Specialist for Cynosure, Mr. Lembke attended high level meetings at Cynosure and was privy to the most sensitive trade secret and confidential information.

73.     Upon information and reasonable belief, Cynosure believes that Mr. Lembke has used and disclosed, and continues to use and disclose, Cynosure's Confidential Information and trade secrets on behalf of InMode and for InMode's benefit.

74.     Upon information and belief, InMode has induced, encouraged, approved and/or ratified Mr. Lembke's aforementioned actions.  The acts of Mr. Lembke were performed on behalf or for the benefit of InMode and/or while in the employment of

InMode, and/or were within the course and scope of that employment or within the authority delegated by InMode.

75. As a result of Mr. Lembke's aforementioned breach of the Non-Competition Agreement, Cynosure has suffered, and will continue to suffer, loss of business opportunity, violation of its intellectual property rights, a loss of business differentiation and reputation and InMode will have acquired enhances positioning and resources to compete in the market, all of which are damages directly or proximately caused by Mr. Lembke's breach of the Non-Competition Agreement.

76. Upon information and reasonable belief, Mr. Lembke has used and disclosed, and continue to use and disclose, Cynosure's Confidential Information on behalf of InMode and for InMode's benefit.

**c.** **Baird**

77. Upon information and belief, Mr. Baird was approached by Mr. Lakhani to join InMode.

78. Mr. Baird's last day of employment with Cynosure was January 30, 2017.

79. Upon information and belief Mr. Baird began assisting InMode while still in the employ of Cynosure.  As evidenced by the January 31, 2017 email, attached hereto as Exhibit 2, Mr. Baird began assisting InMode while still in the employ of Cynosure. On January 30, 2017, Mr. Baird wrote to Mr. Lembke "I know the official start date isn't until Feb[ruary] 6th but I'd like to get a head start on learning some of the new technology and prep for upcoming meetings.  Can you see what we might be able to get out hands on as far as PowerPoint slides and if maybe there [is] a top rep[resentative] in another area who'd be open to chat possible?" (Ex. 2)  In response, Mr. Lembke copied Erik Dowell at InMode and responded: "Erik, I'd like to get Lance some slides and data if possible.

22

He's got some meetings already set and is ready to rock.  Let me know if we can get something in his hands or if we need to wait." (*Id.*)

80. Upon information and belief, while still working for Cynosure, Mr. Baird:

a. contacted clientele of Cynosure on behalf or for the benefit of InMode and in violation of the Non-Competition Agreement;

b. contacted key contact personnel at clientele of Cynosure (via contact information known to Mr. Baird solely by virtue of his employment with Cynosure) on behalf of for the benefit of InMode, and in violation of the Non-Competition Agreement;

c. solicited business on behalf of or for the benefit of InMode in violation of the Non-Competition Agreement;

d. created new accounts with clientele of Cynosure on behalf or for the benefit of InMode in violation of the Non-Competition Agreement; and

e. solicited and is presently continuing to solicit Cynosure's customers and clientele in the geographic area contemplated and encompassed by the Non-Competition Agreement.

81. Upon information and belief, the products which Mr. Baird is selling to Cynosure clients and others, on behalf of InMode, are being manufactured by the use of specifications, marketing information and other data and information proprietary to Cynosure which was retained by Mr. Baird and disclosed to InMode in breach of his Non-Competition Agreement with Cynosure.

82. InMode employed Mr. Baird with knowledge of his contractual obligations, including his confidentiality and non-solicitation obligations, and with the understanding that, in performing his duties for InMode, Mr. Baird might violate his

Non-Competition agreement with Cynosure, including his post-termination confidentiality and non-solicitation obligations.

83.     As Sales Manager for InMode, Mr. Baird's InMode territory covers substantially the same potential customer base and includes many of the same customers as his former Cynosure region. This situation will lead to the inevitable use and disclosure of Cynosure's Confidential Information, and likely already has. Knowledge of Cynosure's Confidential Information about Cynosure's national business and marketing strategies and its customers in his region for InMode places InMode at an unfair competitive advantage against Cynosure.

84.     Through the customer relationships Mr. Baird developed through Cynosure's reputation and goodwill during his employment, and knowledge of customers' purchase history, pricing, any complaints or issues and other Confidential Information, Mr. Baird will be able to call upon, service, and sell to those customers without having to put in the time, effort, research, and work otherwise required to develop those customers and acquire their business – in effect giving InMode an unfair leg up in competing against Cynosure.

85.     Upon information and belief, InMode has induced, encouraged, approved and/or ratified Mr. Baird's aforementioned actions.   The acts of Mr. Baird were performed on behalf or for the benefit of InMode and/or while in the employment of InMode, and/or were within the course and scope of that employment or within the authority delegated by InMode.

86.     As a result of Mr. Baird's aforementioned breach of the Non-Competition Agreement, Cynosure has suffered, and will continue to suffer, loss of business opportunity, violation of its intellectual property rights, a loss of business differentiation

and reputation and InMode will have acquired enhances positioning and resources to compete in the market, all of which are damages directly or proximately caused by Mr. Baird's breach of the Non-Competition Agreement.

87.     Based upon this information, Cynosure believes that Mr. Baird acting on behalf of InMode solicited and induced other Cynosure employees to become employed with InMode, a direct competitor, to harm and disrupt Cynosure's business; and continues to solicit other current employees of Cynosure.

88.     Upon information and reasonable belief, Mr. Baird has used and disclosed, and continue to use and disclose, Cynosure's Confidential Information on behalf of InMode and for InMode's benefit.

     **d.**    **Kaufman**

89.     Upon information and belief Mr. Kaufman was approached by Mr. Lakhani to join InMode.

90.     Mr. Kaufman's last day of employment with Cynosure was January 30, 2017.

91.     Upon information and belief Mr. Kaufman began assisting InMode while still in the employ of Cynosure.

92.     Upon information and belief, while still working for Cynosure, Mr. Kaufman:

    f.   contacted clientele of Cynosure on behalf or for the benefit of InMode and in violation of the Non-Competition Agreement;

///

25

g.   contacted key contact personnel at clientele of Cynosure (via contact information known to Mr. Kaufman solely by virtue of his employment with Cynosure) on behalf of for the benefit of InMode, and in violation of the Non-Competition Agreement;

h.   solicited business on behalf of or for the benefit of InMode in violation of the Non-Competition Agreement;

i.   created new accounts with clientele of Cynosure on behalf or for the benefit of InMode in violation of the Non-Competition Agreement; and

j.   solicited and is presently continuing to solicit Cynosure's customers and clientele in the geographic area contemplated and encompassed by the Non-Competition Agreement.

93.     Upon information and belief, the products which Mr. Kaufman is selling to Cynosure clients on behalf of InMode, are being manufactured by InMode by the use of specifications, marketing information and other data and information proprietary to Cynosure which was retained by Mr. Kaufman and disclosed to InMode in breach of his Non-Competition Agreement.

94.     InMode employed Mr. Kaufman with knowledge of his contractual obligations, including his confidentiality and non-solicitation obligations, and with the understanding that, in performing his duties for InMode, Mr. Kaufman might violate his Non-Competition agreement with Cynosure, including his post-termination confidentiality and non-solicitation obligations.

95.     As Regional Sales Manager for InMode, Mr. Kaufmans's InMode territory covers substantially the same potential customer base and includes many of the same customers as his former Cynosure region. This situation will lead to the inevitable use and

disclosure of Cynosure's Confidential Information, and likely already has. Knowledge of Cynosure's Confidential Information about Cynosure's national business and marketing strategies and its customers in his region for InMode places InMode at an unfair competitive advantage against Cynosure.

96.     Through the customer relationships Mr. Kaufman developed through Cynosure's reputation and goodwill during his employment, and knowledge of customers' purchase history, pricing, any complaints or issues and other Confidential Information, Mr. Kaufman will be able to call upon, service, and sell to those customers without having to put in the time, effort, research, and work otherwise required to develop those customers and acquire their business – in effect giving InMode an unfair leg up in competing against Cynosure.

97.     Upon information and belief, InMode has induced, encouraged, approved and/or ratified Mr. Kaufman's aforementioned actions.  The acts of Mr. Kaufman, were performed on behalf or for the benefit of InMode and/or while in the employment of InMode, and/or were within the course and scope of that employment or within the authority delegated by InMode.

98.     As a result of Mr. Kaufman's aforementioned breach of the Non-Competition Agreement, Cynosure has suffered, and will continue to suffer, loss of business opportunity, violation of its intellectual property rights, a loss of business differentiation and reputation and InMode will have acquired enhances positioning and resources to compete in the market, all of which are damages directly or proximately caused by Mr. Kaufman's breach of the Non-Competition Agreement.

99.     The information Mr. Kaufman had access to and acquired upon his access to Cynosure's Confidential Information and customer contact during and as a result of his

employment with Cynosure, allows him and his agent InMode an unfair competitive advantage with Cynosure.  Further, knowledge of Cynosure's customers, such as their pricing history, gives InMode an unfair competitive advantage in the market as set forth above.

100.    Upon information and belief, Cynosure believes that Mr. Kaufman, in violation of his Non-Competition Agreement and acting on behalf of InMode is soliciting other current employees of Cynosure.

101.    Upon information and reasonable belief, Cynosure believes that Mr. Kaufman has disclosed, and continues to use and disclose, Cynosure's Confidential Information on behalf of InMode and for InMode's benefit.

### IV.    COUNT I – INDUCEMENT TO BREACH CONTRACT

102.    InMode was aware of Mr. Lakhani's Non-Competition and contractual obligations to Cynosure.

103.    InMode, through Mr. Lakhani was aware of Mr. Lembke, Non-Competition Agreement and contractual obligations to Cynosure.

104.    InMode, through Mr. Lakhani and/or Mr. Lembke, was aware of Mr. Baird's, and Mr. Kaufman's Non-Competition and contractual obligations to Cynosure.

105.    Mr. Lakhani's, Mr. Lembke's, Mr. Baird's, and Mr. Kaufman's actions described above violated and continue to violate one or more provisions of their Non-Competition agreement with Cynosure, including the non-disclosure, and non-solicitation provisions.

106.    InMode wrongfully and without justification, induced Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman to breach the non-competition, non-disclosure and/or non-solicitation provisions in their Non-Competition agreements with Cynosure.

28

107.    InMode continues to employ Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman, with knowledge that their employment with InMode violates the terms of their Non-Competition agreements with Cynosure.

108.    InMode's actions have damages Cynosure and its goodwill and caused, and continues to cause, harm to Cynosure for which an adequate remedy at law does not exist.

## V.    COUNT II – INTERFERENCE WITH EMPLOYMENT RELATIONSHIPS

109.    InMode was aware of Cynosure's employment relationship with Mr. Lakhani, Mr. Lembke Mr. Baird, and Mr. Kaufman.

110.    InMode, wrongfully and without justification, interfered with Cynosure's employment relationships with Mr. Lakhani, Mr. Lembke Mr. Baird, and Mr. Kaufman.

111.    InMode's actions have damaged Cynosure and its goodwill and caused, and continue to cause, harm to Cynosure for which an adequate remedy at law does not exist.

## VI.    COUNT III - TORTIOUS INTERFERENCE WITH BUSINESS

112.    InMode was aware of Mr. Lakhani's and Mr. Lembke's employment and position with Cynosure.

113.    InMode was aware that as Cynosure's Regional Sales Director, Mr. Lakhani had access to Cynosure's most valuable trade secrets and confidential information, including but not limited to, its technology plans, marketing plans, customer lists, products, costs, pricing, and product development plans.

114.    Mr. Lakhani and Mr. Lembke owed Cynosure a duty of loyalty during their employment with Cynosure to act only for its benefit and not to its detriment.

115.    Mr. Lakhani and Mr. Lembke's actions described above in working for and/or assisting a direct competitor during their employment with Cynosure breached their duty of loyalty.

116.    InMode induced Mr. Lakhani and Mr. Lembke to breach their duty of loyalty and, therefore, tortuously interfered with Cynosure's business.

117.    InMode's actions described above in inducing Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman to breach their respective Non-Competition Agreements without justification, tortuously interfered with Cynosure's business.

118.    InMode's actions have damages Cynosure and its goodwill and caused, and continue to cause, harm to Cynosure for which an adequate remedy at law does not exist.

## VII.    COUNT IV - VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT

119.    The customer, sales, pricing, marketing, business plans, and financial data of Cynosure described above, and the compilation of that information ("Trade Secrets"), is not generally known to and not readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use.

120.    Cynosure derives independent economic value from its Trade Secrets not being generally known to our readily ascertainable by others.

121.    Being in an extremely competitive industry, Cynosure's competitors, including InMode, can derive economic value from the disclosure and use of Cynosure's Trade Secrets.

122.    Cynosure's Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

123.    Cynosure's Trade Secrets constitutes trade secrets under the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §134(A).002(6).

124.    InMode through the actions and continued actions of Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman – misappropriated Cynosure's Trade Secrets within the meaning of Tex. Civ. Prac. & Rem. Code §134(A).002(3), which defines "misappropriation" as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i)     used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

(a) derived from or through a person who had utilized improper means to acquire it;

(b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii)    before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

125.    InMode, through the actions and continued actions of Mr. Lakhani – its Vice-President of Sales – acquired, misappropriated, and continues to possess Cynosure's Trade Secrets through improper means within the meaning of Tex. Civ. Prac. & Rem. Code §134(A).002(2), which defined "improper means" to "include[] theft, bribery,

misrepresentation, breach of inducement of a breach of duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." Tex. Civ. Prac. & Rem. Code §134(A).002(2).

126.   InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Cynosure's Trade Secrets has caused, and continues to cause, harm to Cynosure for which injunctive relief may be issued under Tex. Civ. Prac. & Rem. Code §134(A).003.

127.   Cynosure has also incurred actual damages as the result of InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Cynosure's Trade Secrets.

128.   InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Cynosure's Trade Secrets was and has been willful and malicious, entitling Cynosure to an award of exemplary damages, pursuant to Tex. Civ. Prac. & Rem. Code §134(A).004, in an amount not exceeding twice any award made, and attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code §134(A).005.

## IX.   DAMAGES

129.   As a direct and proximate result of InMode's conduct, Cynosure has suffered actual damages.  Pursuant to the Texas Civil Practice & Remedies Code, Plaintiff is entitled to recover damages it sustained and costs of suit, including reasonable attorney's fees. Tex. Civ. Prac. & Rem. Code §134(A).005.

# PRAYER FOR RELIEF

Plaintiff asks for judgment against Defendant for the following:

a.     As to the First Claim for Relief, for Inducement to Breach Contract, that this Court enter a Preliminary Injunction and a Permanent Injunction enjoining InMode from employing Mr. Lakhani, Mr. Lembke, Mr. Baird and Mr. Kaufman until the expiration of the non-competition provisions in their respective Non-Competition agreements with Cynosure; that this Court enter a Preliminary Injunction and a Permanent Injunction enjoining InMode from inducing current and former Cynosure employees from violating their Non-Competition agreements with Cynosure; and awarding Cynosure its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity.

b.     As to the Second Claim for Relief, for Interference with Employment Relationships, that this Court enter a Preliminary Injunction and a Permanent Injunction enjoining InMode from interfering with Cynosure's employment contracts and relationships with its employees and that this Court enter a Temporary Restraining Order enjoining InMode from hiring Cynosure employees until the expiration of the non-competition provisions in their respective Non-Competition Agreements; and awarding Cynosure its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity.

c.     As to the Third Claim for Relief, for Tortious Interference with Business, that this Court enter Preliminary Injunction and a Permanent Injunction enjoining InMode from interfering with Cynosure's business; and awarding Cynosure its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity;

d.     As to the Fourth Claim for Relief, for Violation of Texas Uniform Trade Secrets Act, that this Court enter a Preliminary Injunction and a Permanent Injunction enjoining InMode from using, disclosing, and refusing to return Cynosure's proprietary and Confidential Information; awarding Cynosure exemplary damages under Tex. Civ. Prac. & Rem. Code §134(A).004; and awarding Cynosure its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity;

e.     on all claims for attorneys' fees as permitted by contract or statute;

f.     all other relief the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

**GORDON & REES, L.L.P.**

*/s/ Craig Mariam*
Craig Mariam
Attorney in Charge
Texas Bar No. 24063831
Philip Robert Brinson
Texas Bar No. 00787139

1900 West Loop South, Suite 1000
Houston, Texas  77027
T: (713) 961-3366
E-mail: cmariam@gordonrees.com